Exhibit F

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

1345 AVENUE OF THE AMERICAS

NEW YORK, NEW YORK 10105-0143

(212) 603-6300

TELECOPIER: (212) 956-2164

November 20, 2003

WRITER'S DIRECT DIAL
NUMBER:  603-6302
E-MAIL:  pts@robinsonbrog.com

**VIA FEDERAL EXPRESS**

Patrick Glenn, Claims Manager
United States Coast Guard NPFC
4200 Wilson Boulevard, Suite 1000
Arlington, Virginia 22203-1804

  Re: Claim Number 903071-001
    Connecticut Tank Removal Inc., Claimant
    Mystic Bulk Carriers Inc., Respondent

Dear Mr. Glenn:

  Further to my letter of October 20, 2003, Connecticut Tank Removal, Inc. has provided this firm with certain documentation of its above-referenced claim. This documentation was sent by letter dated October 30, 2003 and received a few days thereafter. We have thoroughly reviewed the documentation submitted, and have the following comments.

  1. The documents submitted by claimant reinforce that Mystic acted responsibly in this incident. Among the documents are a Connecticut Department of Environmental Protection Emergency Incident Field Report for the spill (copy enclosed). This Field Report shows that Mystic reported the spill at 09:52, only 17 minutes after the spill occurred (09:35). The report of the spill was made by Mr. Steve Bouton, who works for Action Environmental. Action is a private emergency spill-response firm that Mystic engages to respond to just this type of incident. Action promptly retained claimant on Mystic's behalf to address the spill. This is confirmed by a letter from Action to claimant's lawyer dated June 20, 2002 (copy enclosed).

  2. Mystic believed that it had proper and adequate insurance coverage to pay for the costs of clean-up and remediation. The June 20, 2002 letter from Action referred to above confirms that claimant's invoices, and Action's review thereof, were forwarded to Mystic's insurance broker, CSIR Enterprises, Inc.

{00209051.DOC;1}
00209012.WPD;1

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

Patrick Glenn, Claims Manager
November 20, 2003
Page 2

      3.    Mystic continues to assert that, since claimant negotiated a settlement with CSIR Enterprises, CSIR issued its check to claimant, and CSIR, without Mystic's knowledge, issued a "stop payment" order on its check, this is a matter between claimant and CSIR. In short, CSIR accepted responsibility for paying claimant, then failed to honor its commitment. These facts bear repeating because the documents sent to us by claimant *do not* contain any correspondence with Mystic's insurance company or broker. As pointed out in my October 20, 2002 letter to you, 33 C.F.R. 136.105(e)(10) requires that claimant submit copies of all of its written communication with Mystic's insurance broker and liability carrier. No such communication is contained within the documents sent to this firm by claimant. By copy of this letter to claimant's counsel, we are requesting that all such documentation be provided to us.

      4.    Mystic has done everything that is expected of a responsible transporter. It employed an insurance broker to obtain environmental insurance coverage; it paid a substantial premium for this insurance coverage; it retained a spill response firm; when a spill occurred its spill response firm promptly reported the spill and engaged a firm to clean up the spill and minimize any environmental damage. These are the actions of an exemplary company. We question whether the NPFC was intended to punish such companies when their insurance brokers default.

      5.    Having reviewed the documentation submitted by claimant, we also take issue with some of the claimant's charges. Without conceding that Mystic is liable for these charges, we point out the following:

      (a)    claimant apparently bills at the "overtime" rate of "time and a half" for all work done after 5:00 pm on weekdays, regardless of whether its worker had worked a full 8 hours to that point. (In some cases, it appears that the worker had not worked any hours at "straight" time before time and a half was applied.) Examples of this appear on the invoices for Monday 11/26/01, Tuesday 11/27/01, and Wednesday 11/28/01. It is customary to pay a shift differential for evening and night work, but not time and a half. (When I worked as a merchant seaman, standing two 4-hour watches a day, we did not receive any extra pay for the evening or night watch.) We believe that the invoices should be recalculated such that time for the first 8 hours of each worker on a weekday is charged at a straight time rate.

      (b)    Claimant has charged a 15% mark-up of all bills that it has received from its subcontractors. This amounts to several thousand dollars. Claimant should not recover a premium on the bills of its subcontractors. We believe that the claim should be restated by deleting the 15% markup of subcontractor bills.

{00209051.DOC;1}
00209012.WPD;1

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

Patrick Glenn, Claims Manager
November 20, 2003
Page 3

    (c) Various items reflect either an inaccurate charge for time, or an inaccurate charge for a subcontractor's invoice. In particular:

      i. 11-24-01 bill for Case Uni-Loader is for 6 hours, but claimant's Daily Job Report ("DJR") shows it was used from 1:30 to 6:00 pm (4.5 hours);

      ii. 11/25/01 bill has "Walter" at 14.5 hours (all overtime), but the DJR shows he worked 7:30 am to 7:00 pm (11.5 hours);

      iii. 11/27/01 bill for Truck 2 is for 21 hours, but the DJR shows Truck 2 was used from 10:00 am to 12:00 midnight (14 hours);

      iv. 11-28-01 bill has "Tim" at 7.5 overtime hours, when he worked from 5:00 pm to 12:00 midnight as overtime (7 hours);

      v. 12/07/01 bill for F-550 Rack Body is for 4 hours, but the DJR shows this vehicle was used from 4:00 pm to 6:00 pm (2 hours);

      vi. 12/10/01 bill lists a Drum Disposal charge on the United Industrial invoice for $6,875.00, while the actual invoice lists the charge as $3,662.50; and

      vii. 12/01/01 bill lists a United Industrial invoice as $22,379.32, while the actual invoice is for $22,328.30.

    (d) Some other items lack back-up either in the form of an invoice from a subcontractor, or an entry on the Daily Job Report:

      i. 11/26/01 bill lists a Gas Meter for $58.00, not mentioned in the DJR;

      ii. 11/27/01 bill lists a 4 Yard Wheel Loader for $1,105, not mentioned in the DJR;

      iii. 11/29/01 bill lists a Gas Meter for $58.00, not mentioned in the DJR;

      iv. 12/02/01 bill lists two 55-gallon drums for $99.00, not mentioned in the DJR;

      v. 12/05/01 bill lists a Case Uni Loader for $270, not mentioned in the DJR;

      vi. 12/10/01 bill lists Truck 32 for 4 hours for $120.00, not mentioned in the DJR;

      vii. 12/10/01 bill lists Processed Gravel for $444.30, not mentioned in the DJR;

      viii. 12/01/01 bill lists 1546.68 tons of Soil Transport per Invoice 11960 at a cost of $9,280.08 (plus 15% markup), but there is no corresponding invoice from the subcontractor; and

{00209051.DOC;1}
00209012.WPD;1

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

Patrick Glenn, Claims Manager
November 20, 2003
Page 4

      ix.   2/20/02 bill lists invoices from Connecticut State Police ($535.61) and Extreme Environmental ($8,506.29) (plus 15% markup), but there are no corresponding invoices.

If the NPFC determines that this is an appropriate case for payment, which Mystic disputes for the reasons previously stated, the claim needs to be re-submitted with the appropriate adjustments made for the items detailed above.

Please feel free to contact me if you have any questions regarding this matter.

Very truly yours,

Philip T. Simpson

cc: Jacobi & Case, P.C. (attorneys for CTR) (by Federal Express)
    Ronald B. Goodman, Esq.

{00209051.DOC;1}
00209012.WPD;1